[Cite as *State v. Haller*, 2012-Ohio-5233.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                 CASE NO. 1-11-34

     v.

RONALD HALLER,                       O P I N I O N

     DEFENDANT-APPELLANT.


Appeal from Allen County Common Pleas Court
Trial Court No. CR2010 0350

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: November 13, 2012


APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Jana E. Emerick* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Ronald Haller, appeals the judgment of the Court of Common Pleas of Allen County finding him guilty of three counts of complicity to commit aggravated burglary, three counts of complicity to commit aggravated robbery, three counts of complicity to commit abduction, two counts of complicity to commit burglary, two counts of complicity to commit grand theft, and one count of receiving stolen property, and sentencing him to an aggregate prison term of thirty-one years. On appeal, Haller contends that the verdict forms for Counts X and XII were insufficient under R.C. 2945.75 to support his convictions for second degree felonies; that the trial court erred when it did not merge Counts XI, XII, and XV, and when it did not merge Counts XIII and XIV; that the trial court erred by not declaring R.C. 2941.25 unconstitutional; that the trial court erred in imposing multiple sentences for the same act in violation of R.C. 2941.25; that the trial court erred in instructing the jury on complicity; that he was denied effective assistance of counsel; and that the convictions were against the manifest weight of the evidence. Based on the following, we affirm in part and reverse in part the trial court's judgment.

{¶2} This matter stems from a series of burglaries that occurred at five separate residences in Allen County between November 2008 and May 2010. Each burglary was committed by an individual named Benny Woolwine ("Woolwine"). The first burglary occurred on November 5, 2008 at a residence on

Ottawa Road ("Ottawa Burglary"). The second burglary occurred on August 26, 2009 at a residence on Highland Lakes Drive ("Highland Burglary"). The first two burglaries were committed when the residents were away and resulted in the theft of guns and other items from the residences. The third burglary occurred on December 14, 2009 at a residence on Amherst Road ("Amherst Burglary"). The fourth burglary occurred on May 5, 2010 at a residence on Gomer Road ("Gomer Burglary"). The fifth burglary occurred on May 19, 2010 at a residence on Kissing Hollow Drive ("Kissing Hollow Burglary"). The last three burglaries were committed when someone other than an accomplice was present in the residence. On each occasion, Woolwine held an individual at gunpoint, bound the individual's hands and feet, and proceeded to steal various items from the residence. In July 2010, law enforcement arrested Woolwine in connection with the foregoing burglaries. Eventually, Woolwine confessed that he committed the burglaries and that Haller had aided and/or abetted him in each of the burglaries.

{¶3} On October 14, 2010, the Allen County Grand Jury returned a fifteen count indictment against Haller. As to the Amherst Burglary, Haller was charged as follows: Count I, complicity to commit aggravated burglary in violation of R.C. 2911.11(A) and R.C. 2923.03(A)(2), a felony of the first degree with a firearm specification under R.C. 2941.145(A); Count II, complicity to commit aggravated robbery in violation of R.C. 2911.01(A)(1) and R.C. 2923.03(A)(2), a felony of the first degree with a firearm specification under R.C. 2941.145(A); and, Count

III, complicity to commit abduction in violation of R.C. 2905.02(A)(2) and R.C. 2923.03(A)(2), a felony of the third degree with a firearm specification under R.C. 2941.145(A). As to the Gomer Burglary, Haller was charged as follows: Count IV, complicity to commit aggravated burglary in violation of R.C. 2911.11(A) and R.C. 2923.03(A)(2), a felony of the first degree with a firearm specification under R.C. 2941.145(A); Count V, complicity to commit aggravated robbery in violation of R.C. 2911.01(A)(1) and R.C. 2923.03(A)(2), a felony of the first degree with a firearm specification under R.C. 2941.145(A) and a forfeiture specification under R.C. 2981.02(A)(3) and R.C. 2941.1417; Count VI, complicity to commit abduction in violation of R.C. 2905.02(A)(2) and R.C. 2923.03(A)(2), a felony of the third degree with a firearm specification under R.C. 2941.145(A); Count VII, complicity to commit kidnapping in violation of R.C. 2905.01(A)(2) and R.C. 2923.03(A)(2), a felony of the first degree with a firearm specification under R.C. 2941.145(A). As to the Kissing Hollow Burglary, Haller was charged as follows: Count VIII, complicity to commit aggravated robbery in violation of R.C. 2911.01(A)(1) and R.C. 2923.03(A)(2), a felony of the first degree with a firearm specification under R.C. 2941.145(A); Count IX, complicity to commit aggravated burglary in violation of R.C. 2911.11(A) and R.C. 2923.03(A)(2), a felony of the first degree with a firearm specification under R.C. 2941.145(A); and, Count X, complicity to commit abduction in violation of R.C. 2905.02(A)(2) and R.C. 2923.03(A)(2), a felony of the third degree with a firearm specification under R.C.

2941.145(A). As to the Ottawa Burglary, Haller was charged as follows: Count XI, complicity to commit burglary in violation of R.C. 2911.12(A)(2) and R.C. 2923.03(A)(2), a felony of the second degree; and, Count XII, complicity to commit grand theft in violation of R.C. 2913.02(A)(1) & (B)(4) and R.C. 2923.03(A)(2), a felony of the third degree. As to the Highland Burglary, Haller was charged as follows: Count XIII, complicity to commit burglary in violation of R.C. 2911.12(A)(2) and R.C. 2923.03(A)(2), a felony of the second degree; and, Count XIV, complicity to commit grand theft in violation of R.C. 2913.02(A)(1) & (B)(4) and R.C. 2923.03(A)(2), a felony of the third degree. Finally, Haller was charged with Count XV, receiving stolen property in violation of R.C. 2913.51(A), a felony of the fourth degree.

{¶4} On October 18, 2010, Haller entered pleas of not guilty to all counts in the indictment.

{¶5} On April 11, 2011, the matter proceeded to a jury trial. Prior to trial, the State dismissed Count VII. On April 15, 2011, the jury returned guilty verdicts on all remaining counts and specifications. On May 19, 2011, the matter proceeded to sentencing. As to the Amherst Burglary, the trial court sentenced Haller to a six-year prison term on Count I, a six-year prison term on Count II, and a mandatory three-year prison term on the firearm specification, and ordered Counts I and II be served concurrently to each other, but consecutively to the

sentence imposed for the firearm specification.[1]  As to the Gomer Burglary, the trial court sentenced Haller to a six-year prison term on Count IV, a six-year prison term on Count V,[2] and a mandatory three-year prison term on the firearm specification, and ordered Counts IV and V be served concurrently to each other, but consecutively to the sentence imposed for the firearm specification.[3]  As to the Kissing Hollow Burglary, the trial court sentenced Haller to a six-year prison term on Count VIII, a six-year prison term on Count IX, and a mandatory three-year prison term on the firearm specification, and ordered Counts VIII and IX be served concurrently to each other, but consecutively to the sentence imposed for the firearm specification.[4]  As to the Ottawa Burglary, the trial court sentenced Haller to a two-year prison term on Count XI and a two-year prison term on Count XII, and ordered Counts XI and XII be served concurrently to each other.  As to the Highland Burglary, the trial court sentenced Haller to a two-year prison term on Count XIII and a two-year prison term on Count XIV, and ordered Counts XIII and XIV be served concurrently to each other.  As for Count XV, the trial court sentenced Haller to a one-year prison term to be served concurrently to Count XII.

---

[1] Prior to sentencing, the trial court determined that Count II, complicity to commit aggravated robbery, and Count III, complicity to commit abduction, were allied offenses of similar import.  The State elected to pursue Count II for purposes of sentencing.

[2] As to the forfeiture specification associated with Count V, the jury found that Haller's vehicle, a 2000 Chevrolet Suburban, was subject to forfeiture.

[3] Prior to sentencing, the trial court determined that Count V, complicity to commit aggravated robbery, and Count VI, complicity to commit abduction, were allied offenses of similar import.  The State elected to pursue Count V for purposes of sentencing.

[4] Prior to sentencing, the trial court determined that Count VIII, complicity to commit aggravated robbery, and Count X, complicity to commit abduction, were allied offenses of similar import.  The State elected to pursue Count VIII for purposes of sentencing.

In sum, the Haller was sentenced to an aggregate prison term of thirty-one years. The trial court further ordered Haller to pay restitution to the victims in an amount totaling $15,155.00,[5] and, after a forfeiture hearing, that his vehicle, a 2000 Chevrolet Suburban, be forfeited to the Allen County Commissioners.

{¶6} It is from this judgment Haller appeals, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT ERRED BY ENTERING A JUDGMENT OF CONVICTION AS TO COUNTS XI AND XII (BURGLARY) AS FELONIES OF THE SECOND DEGREE, AND SENTENCING ACCORDINGLY, AS THE VERDICT FORMS WERE SUFFICIENT AS TO EACH ONLY FOR THE LESSER OFFENSES OF BURGLARY, FELONIES OF THE FOURTH DEGREE.**

### Assignment of Error No. II

**MR. HALLER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO TRIAL BY JURY, NOTICE, DUE PROCESS, AND PROOF BEYOND A REASONABLE DOUBT WHEN THE TRIAL COURT REFUSED TO MERGE COUNTS XI, XII, AND XV TOGETHER AND COUNTS XIII AND XIV TOGETHER AS ALLIED OFFENSES OF SIMILAR IMPORT.**

### Assignment of Error No. III

**THE TRIAL COURT ERRED BY NOT DECLARING R.C. §2941.25 UNCONSTITUTIONAL AND VOID FOR VAGUENESS, AS A RESULT OF WHICH THE TRIAL COURT SHOULD HAVE MERGED ALL ALLIED OFFENSES.**

---

[5] The trial court ordered that Haller and Woolwine were jointly and severally responsible for the total amount of the restitution.

*Assignment of Error No. IV*

**THE TRIAL COURT ERRED BY IMPOSING MULTIPLE SENTENCES FOR THE SAME ACT, IN VIOLATION OF R.C. §2941.25 AND OF THE DOUBLE JEOPARDY CLAUSES OF THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION.**

*Assignment of Error No. V*

**THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON COMPLICITY.**

*Assignment of Error No. VI*

**MR. HALLER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN THAT COUNSEL FAILED TO OBJECT TO MISLEADING AND INCOMPLETE JURY INSTRUCTIONS AS TO COMPLICITY.**

*Assignment of Error No. VII*

**THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶7} Due to the nature of Haller's assignments of error, we elect to address the assignments out of order and combine the assignments where appropriate.

*Assignment of Error No. VII*

{¶8} In his seventh assignment of error, Haller contends that the jury's verdicts were against the manifest weight of the evidence. Specifically, Haller argues that the evidence adduced at trial establishes that he was, at most, an accessory after the fact, not an accomplice to the crimes committed by Woolwine. We disagree.

{¶9} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), superseded by constitutional amendment on other grounds as stated by *State v. Smith*, 80 Ohio St.3d 89 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id*.

{¶10} Initially, we note that Haller's contention challenging the manifest weight of the evidence extends only to the issue of complicity. Haller does not dispute the occurrence of the burglaries or the offenses that occurred in conjunction with the burglaries. Accordingly, our analysis will focus on whether the fact finder lost its way in determining whether Haller aided and/or abetted Woolwine in committing the burglaries.

{¶11} R.C. 2923.03, Ohio's complicity statute, provides, in relevant part:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

* * *

(2) Aid or abet another in committing the offense[.]

**{¶12}** "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. In particular, the defendant's criminal intent may be inferred from his or her presence, companionship, and conduct before and after the offense is committed. *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, ¶ 13, citing *Johnson* at 245. The elements of aiding and abetting another in the commission of a crime may be demonstrated by both direct and circumstantial evidence. *In re Williams*, 3d Dist. No. 9-10-64, 2011-Ohio-4338, ¶ 20, citing *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, ¶ 29 (8th Dist.).

**{¶13}** According to the testimony adduced at trial, Woolwine, a convicted felon, moved to Ohio in 2007. In May 2008, Woolwine moved to Lima to live with a friend. Woolwine testified that prior to May 2008, he had never been to Lima nor was he familiar with the areas surrounding Lima. Shortly after Woolwine arrived in Lima, there was a fire at a rental property that Haller oversaw as landlord. When Haller responded to the fire, he met Woolwine at the property.

Woolwine testified that Haller asked him whether he wanted to help repair the damaged property, and he agreed. Haller testified that he liked Woolwine's work on the rental property and continued to give Woolwine construction projects. Woolwine testified that he informed Haller of his criminal history shortly after he met him, and that despite his criminal history Haller treated him very well and, as a result, he looked up to Haller.

*Ottawa Burglary*

{¶14} Todd Lhamon ("Lhamon") testified that he resided at the Ottawa Road residence when it was burglarized on November 5, 2008. Lhamon testified that prior to the burglary he owned and operated a business in Lima that sold all-terrain vehicles, boats, jet skis, and lawn mowers. Lhamon testified that in 2002 he decided to sell his business and that Haller was interested in purchasing the business. Lhamon explained that in order to purchase the business each of the manufacturers that sold their products through the business had to approve the sale. Lhamon testified that prior to closing his business Haller had visited his Ottawa Road residence on several occasions to discuss the business. Lhamon testified that despite Haller's interest in the business one of the manufacturers did not approve the sale, and, as a result, Haller could not purchase the business.

{¶15} Woolwine testified that Haller informed him of his failed attempt to purchase Lhamon's business. Woolwine testified that he asked Haller "why don't you do something about it?" and that Haller replied that he could not do anything.

Trial Tr., p. 149. Woolwine testified that in light of how Haller had treated him he felt obligated to help Haller, so he offered to do something to Lhamon. Woolwine testified that Haller showed him where Lhamon lived and informed him that he would find guns in the residence. On November 5, 2008, Woolwine burglarized Lhamon's residence. Woolwine testified that he stole several guns, a crossbow, a compound bow, several knives, a white Xbox video game console ("Xbox"), and several video games and movies. Woolwine testified that immediately following the burglary he called Haller informing him of the burglary and that he was driving to his (Haller's) residence. Woolwine testified that he left all of the stolen items with Haller, except for the Xbox, which he kept for personal use. Woolwine testified that he eventually gave the Xbox to Haller, because Haller wanted to give it to his girlfriend, Elizabeth Rivera ("Rivera").

{¶16} Lhamon testified that several guns, a Foxfire crossbow, a compound bow, some Gerber knives, a white Xbox, and several video games and movies where stolen from his residence on November 5, 2008. At trial, Lhamon identified State's exhibit 43 as one of the guns stolen from his residence.

{¶17} Rivera testified that she and Haller were in a relationship between January 2009 and July 2010. Rivera testified that in February 2010, Haller asked her to sell several items on eBay and that she listed the items as being sold from her residence in Sidney, Ohio. Rivera testified that Haller gave her a Foxfire crossbow, a compound bow, a Gerber knife, as well as other miscellaneous items

to sell on eBay. Rivera testified that she sold the Foxfire crossbow, the compound bow, and the Gerber knife and transferred the proceeds to Haller via a Paypal account. Rivera also testified that in December 2009 Haller sold her a used Xbox that he received from Woolwine.

{¶18} Detective Mark Baker ("Detective Baker"), of the Allen County Sheriff's Office, testified that he arrested Haller. Detective Baker testified that a subsequent inventory search of the vehicle Haller was driving at the time of his arrest yielded a shotgun. At trial, Detective Baker identified State's exhibit 43 as the shotgun found in Haller's vehicle.

{¶19} Haller testified that he informed Woolwine of the failed attempt to purchase Lhamon's business, but never told Woolwine that he was angry with Lhamon or that he wanted to get even with Lhamon. Haller testified that he never asked Woolwine to burglarize Lhamon's residence, nor was he aware that Woolwine had committed the burglary until Woolwine's arrest. Haller testified that he bought the shotgun marked as State's exhibit 43 from Woolwine, but had no idea that Woolwine had stolen the shotgun from Lhamon's residence. Haller also testified that none of the items he asked Rivera to sell on eBay were from Woolwine.

*Highland Burglary*

{¶20} David Smelcer ("Smelcer") testified that he resided at the Highland Lakes Drive residence when it was burglarized on August 26, 2009. Smelcer testified that prior to the burglary he and Haller were close friends and worked together for Colonial Insurance. Smelcer testified that in 2005 he ended his business and social relationship with Haller.

{¶21} Woolwine testified that Haller informed him of how Smelcer, in his opinion, "messed him out of [an] insurance" business. Trial Tr., p. 157. Woolwine testified that he burglarized Smelcer's residence because, like Lhamon, it was another individual who mistreated Haller. Woolwine testified that Haller showed him where Smelcer lived and informed him that he would find guns in the residence. Woolwine also testified that he knew Smelcer and his family were not at the residence at the time of the burglary because Haller had informed him that they were at the Allen County Fair. Woolwine testified that immediately following the burglary he called Haller to inform him of the burglary. In the same call, Woolwine also informed Haller that he was taking the guns he stole from Smelcer's residence to his residence. Woolwine testified that Haller subsequently came over to his residence and took the guns.

{¶22} Haller testified that he informed Woolwine of his past business and social relationship with Smelcer, but never told Woolwine that he was angry with Smelcer or that he wanted to get even with Smelcer. Haller also testified that he

never asked Woolwine to burglarize Smelcer's residence, nor was he aware that Woolwine had committed the burglary until Woolwine's arrest.

*Amherst Burglary*

{¶23} Woolwine testified that he committed the Amherst Burglary because he owed Haller money. Woolwine testified that Haller showed him the residence on Amherst Road and informed him that he would find numerous guns in the residence. Woolwine testified that as he was burglarizing the residence a service man from a heating and cooling company entered the residence. Woolwine testified that he held the service man at gun point with a gun he received from Haller. Woolwine testified that his girlfriend, Tammy Jones ("Jones") picked him up after the burglary and drove him home. Woolwine testified that he called Haller informing him about the burglary, and that Haller came by his residence and took several of the stolen items.

{¶24} Paul Sell ("Sell"), a service man for a local heating and cooling company, testified that he made a service call to the Amherst Road residence on December 14, 2009. Sell testified that he arrived at the Amherst Road residence between 8:00 a.m. and 8:15 a.m. Sell testified that upon entering the residence he was confronted by a masked man wielding a gun. Sell testified that the man bound his hands and feet and proceeded to ransack the residence. Sell testified that the man ransacked the residence "for about a half an hour or 45 minutes * * *." Trial Tr., p. 278.

**{¶25}** Detective Baker testified that phone records introduced into evidence revealed that Woolwine and Haller exchanged a series of calls on the day of the Amherst Burglary. Specifically, Detective Baker testified that the phone records revealed that Woolwine and Haller exchanged six calls between 10:18 a.m. and 10:27 a.m. on December 14, 2009.

**{¶26}** Haller testified that he did not know anyone who resided at the Amherst Road residence. Haller also testified that he never asked Woolwine to burglarize the Amherst Road residence, nor was he aware that Woolwine had committed the burglary until Woolwine's arrest.

*Gomer Burglary*

**{¶27}** Like the Amherst Burglary, Woolwine testified that he committed the Gomer Burglary because he owed Haller money. Unlike the Amherst Burglary, Woolwine learned of the Gomer Road residence when he overheard "some guys talking about it at work." Trial Tr., p. 170. Woolwine testified that Haller knew he was going to burglarize the Gomer Road residence and that Haller had arranged to pick him up after the burglary. Woolwine testified that he committed the burglary at approximately 11:00 a.m. Woolwine testified that after he completed the burglary he stole the resident's vehicle and called Haller. Woolwine testified that he drove to a secluded location on a gravel road running parallel to railroad tracks. Woolwine testified that Haller had identified the location prior to the burglary. Woolwine testified that Haller backed his silver

Chevrolet Suburban ("Suburban") down the gravel road to where he was waiting and exchanged the stolen items.

{¶28} Sherri Norris ("Norris") testified that she lived and was present at the Gomer Road residence when it was burglarized on May 5, 2010. Norris testified that at approximately 10:45 a.m. she was preparing to leave her residence when she was approached by a masked man wielding a gun. Norris testified that the man proceeded to bind her hands and feet and ransack her residence. Norris testified that at approximately 11:20 a.m., after the man had left, she freed herself and sought help. Norris testified that the man stole her vehicle, a dark blue Ford Explorer ("Explorer").

{¶29} Chad Roberts ("Roberts"), a railroad employee, testified that on May 5, 2010, he was working in the area where Woolwine testified to meeting Haller following the Gomer Burglary. Roberts testified that between 11:30 a.m. and 12:00 p.m. he witnessed what appeared to be a dark blue or black Explorer driving quickly down the gravel road. Roberts testified that shortly after seeing the Explorer he witnessed a large silver SUV backing down the gravel road. At trial, Roberts identified State's exhibit 31, a color picture of Haller's Suburban, as the SUV he saw backing down the gravel road on May 5, 2010.

{¶30} Detective Baker testified that phone records introduced into evidence revealed that Woolwine and Haller exchanged a series of calls on the day of the Gomer Burglary. Specifically, Detective Baker testified that the phone records

revealed that Woolwine and Haller exchanged calls at 8:01 a.m., 9:41 a.m., 11:16 a.m., and 11:35 a.m. on May 5, 2010.

**{¶31}** Haller testified that he did not know anyone who resided at the Gomer Road residence. Haller also testified that he never asked Woolwine to burglarize the Gomer Road residence, nor was he aware that Woolwine had committed the burglary until Woolwine's arrest.

*Kissing Hollow Burglary*

**{¶32}** Like the Amherst and Gomer burglaries, Woolwine testified that he committed the Kissing Hollow Burglary because he owed Haller money. Woolwine testified that Haller had pointed out several residences on Kissing Hollow Drive, which "gave [him the] idea" to burglarize one of the residences. Trial Tr., p. 181. Woolwine testified that the burglary occurred between 9:30 p.m. and 10:00 p.m. Woolwine testified that after he left the Kissing Hollow residence he called Haller and informed him that he just committed a burglary and needed a ride. Woolwine testified that he and Haller exchanged several phone calls immediately following the burglary, during which they determined where and how Haller was going to pick him up.

**{¶33}** Carl Worsham ("Worsham") testified that he lived and was present at the Kissing Hollow residence when it was burglarized on May 19, 2010. Worsham testified that he returned to his residence at approximate 9:30 p.m. After parking in the garage, Worsham exited his vehicle and found a masked man

wielding a gun. Worsham testified that the man proceeded to bind his hands and feet and steal several items from his person and vehicle.

{¶34} Detective Baker testified that phone records introduced into evidence revealed that Woolwine and Haller exchanged a series of calls on the day of the Kissing Hollow Burglary. Specifically, Detective Baker testified that the phone records revealed that Woolwine and Haller exchanged six successive calls between 9:19 p.m. and 10:37 p.m. on May 19, 2010.

{¶35} Haller testified that he did not know anyone who resided at the Kissing Hollow residence. Haller also testified that he never asked Woolwine to burglarize the Kissing Hollow residence, nor was he aware that Woolwine had committed the burglary until Woolwine's arrest.

{¶36} Upon considering the foregoing evidence, we find that Haller's convictions for complicity were not against the manifest weight of the evidence. There was direct evidence, adduced through Woolwine's testimony, that Haller intended to and did aid and/or abet Woolwine in the commission of the Ottawa, Highland, Amherst, Gomer, and Kissing Hollow burglaries. In particular, Woolwine's testimony reveals that Haller aided and/or abetted Woolwine in various ways for each of the burglaries.

{¶37} With respect to the Ottawa burglary, Woolwine's testimony reveals that Haller showed him where Lhamon's residence was located, which was essential due to Woolwine's unfamiliarity with the area, and informed him that

Lhamon stored guns in his residence, which facilitated the resulting theft. With respect to the Highland Burglary, Woolwine's testimony reveals that Haller, who was now aware of Woolwine's willingness to commit criminal offenses on his behalf, showed him where Smelcer's residence was located, informed him that the Smelcer's would be away from their residence, which facilitated the burglary, and informed him that Smelcer stored guns in his residence. With respect to the Amherst Burglary, Woolwine's testimony reveals that Haller showed him where the residence was located, that the residence contained numerous guns, and gave him the gun used during the burglary. With respect to the Gomer Burglary, Woolwine's testimony reveals that Haller had prior knowledge of the burglary and arranged to pick Woolwine up at a pre-determined location following the burglary. These actions could reasonably be construed as having both aided and abetted Woolwine in the commission of the Gomer Burglary. With respect to the Kissing Hollow Burglary, Woolwine's testimony reveals that Haller had showed him where the residence was located and arranged to pick him up after the burglary. Other than Haller's own testimony to the contrary, there was little to no evidence contradicting Woolwine's testimony.

{¶38} In addition to Woolwine's testimony, the State presented evidence which, if believed, corroborated Woolwine's testimony, and supports the conclusion that Haller intended to and did aid and/or abet Woolwine in the commission of all five burglaries. First, Haller's girlfriend, Rivera, testified that in

February 2010 Haller asked her to sell a Foxfire crossbow, a compound bow, and Gerber knife, which were the very items Woolwine testified to stealing and Lhamon testified were missing after the burglary. In addition, Rivera testified that Haller sold her a used Xbox that he received from Woolwine, an item which Woolwine testified to stealing from Lhamon's residence. Second, Roberts' testimony about the vehicles he saw driving down the gravel road on the day of the Gomer Burglary corroborated Woolwine's testimony, and identified Haller's vehicle as one of the vehicles he saw driving down the gravel road. Lastly, Haller's phone records corroborated Woolwine's testimony that he and Haller exchanged several phone calls following the Gomer, Amherst, and Kissing Hollow burglaries. Considering the foregoing evidence in light of Woolwine's testimony and the lack of contradictory evidence, we find that Haller's convictions for complicity were not against the manifest weight of the evidence

{¶39} Accordingly, we overrule Haller's seventh assignment of error.

*Assignments of Error Nos. V & VI*

{¶40} In his fifth and sixth assignments of error, Haller contends that the trial court erred in instructing the jury on complicity, and that he was denied effective assistance of counsel because his attorney did not object to the complicity instruction given by the trial court. We disagree.

{¶41} Initially, we note that Haller did not object to any of the jury instructions. In fact, defense counsel stated that he was "satisfied" with the

-21-

instructions. Trial Tr., p. 880. Crim.R. 30(A) provides, in relevant part, that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Thus, "[a]bsent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal." *State v. Underwood*, 3 Ohio St.3d 12, 13 (1983).

{¶42} In order to have plain error under Crim.R. 52(B), there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must have affected "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *Id.* Accordingly, plain error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431 (1997).

{¶43} It is well established that a defendant is entitled to have the trial court give complete and accurate jury instructions on all the issues raised by the evidence. *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992). When reviewing the trial court's charge, a "single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *State v. Price*, 60 Ohio St.2d 136, 141 (1979), quoting *Cupp v. Naughter*, 414 U.S. 141, 146-147,

94 S.Ct. 396 (1973). Viewing the instructions in their totality, if the law is clearly and fairly expressed, a reviewing court should not reverse a judgment based upon an error in a portion of a charge. *State v. Johnson*, 3d Dist. No. 16-03-09, 2004-Ohio-1513, ¶ 30, citing *Margroff v. Cornwell Quality Tools, Inc.*, 81 Ohio App.3d 174, 177 (9th Dist. 1991). "Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party." *State v. Farr*, 3d Dist. No. 13-06-16, 2007-Ohio-3136, ¶ 14, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist. 1993).

{¶44} The instruction defining complicity appeared within the context of the instruction for Count I, aggravated burglary. The trial court's instruction on complicity reads as follows:

**COMPLICITY**

When two or more persons have a common purpose to commit a crime, and one does one first and a second performs another, those acting together are equally guilty of the crime.

**AID**

"Aid" means to help, assist or strengthen.

**ABET**

"Abet" means to encourage, counsel, incite or assist.

If you find beyond a reasonable doubt that Ronald L. Haller knowingly aided, helped, assisted or encouraged another in the commission of Aggravated Burglary in Count 1, he is regarded as if

he was the principal offender and is just as guilty as if he personally performed every act constituting Aggravated Burglary.

**NOTE:** This instruction also applies to Counts 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13 and 14, in that the defendant is alleged to be in complicity with another in committing the specific offense.

Likewise, in the Gun Specification, the "Complicity" definition applies as to not only Count 1, but Counts 2, 3, 4, 5, 6, 8, 9, and 10.

Each count and where the Gun Specification applies are to be considered separately. (Docket No. 119).

In addition to the foregoing instruction, the instructions for Counts I through XIV each stated that in order to find Haller guilty of complicity for the given offense, the jury must find beyond a reasonable doubt that Haller acted with the kind of culpability required for the commission of the given offenses, by aiding or abetting another in committing the given offense.

{¶45} Haller contends that the complicity instruction was flawed in four respects: (1) the phrase "one does one first" rendered the instruction meaningless and nonsensical; (2) the instruction did not contain the caveat that "mere association with one who perpetrates an unlawful act does not render a person a participant in the crime so long as his acts are innocent"; (3) the instruction did not properly reflect the requirement that one must act with the kind of culpability required for the commission of an offense to be guilty of complicity; and, (4) that it was error to not instruct the jury that an accessory after the fact cannot be guilty of complicity. We will address each argument in turn.

**{¶46}** First, we are not persuaded by Haller's argument that the phrase "one does one first" rendered the instruction meaningless and nonsensical. "Reversible error ordinarily cannot be predicated upon one paragraph, one sentence or *one phrase* of the general charge." (Emphasis added.) *State v. Porter*, 14 Ohio St.2d 10, 13 (1968). This is so because the alleged error must be viewed in the context of the overall charge. *Price*, 60 Ohio St.2d at 141. Here, the phrase highlighted by Haller is missing the word "act" or "part," a fact the State concedes. *See State v. Bridge*, 3d Dist. No. 1-06-30, 2007-Ohio-1764, ¶ 15. Certainly the instruction should have read "when two or more persons have a common purpose to commit a crime, and one does one part [or act] first and a second performs another, those acting together are equally guilty of the crime." Despite this omission, when viewing the complicity instruction as a whole and in the context of the overall charge, we find that this omission does not render the instruction meaningless or nonsensical.

**{¶47}** Next, we are not persuaded by Haller's argument that it was necessary to include the admonition that "mere association with one who perpetrates an unlawful act does not render a person a participant in the crime so long as his acts are innocent." "In a criminal case, if requested special instructions to the jury are correct, pertinent and timely presented, they must be included, at least in substance, in the general charge." *Cincinnati v. Epperson*, 20 Ohio St.2d 59 (1969), paragraph one of the syllabus, overruled in part on other grounds, *State*

*v. Carter*, 72 Ohio St.3d 545 (1995). While the foregoing admonition is an accurate statement of law and is pertinent, we find nothing in the record to confirm that Haller requested this instruction be given by the trial court.

{¶48} Additionally, Haller does not cite any authority requiring that such an admonition be expressly provided to the jury where the defendant is charged with complicity. Reviewing the charge in its totality, we note that the complicity instruction required a finding that Haller associated with Woolwine, the principal offender, with a common purpose of committing the given offense. Clearly, the complicity instruction, as a whole, requires that the defendant engage in some active participation in the given offense before he can be found guilty of complicity. Accordingly, we find that the trial court did not err by omitting the foregoing admonition. *See State v. Stubblefield*, 8th Dist. No. 46436 (Sept. 29, 1983).[6]

{¶49} Next, we are not persuaded by Haller's argument that the complicity instruction did not properly reflect the requirement that one must act with the kind of culpability required for the commission of an offense to be guilty of complicity. While the instruction defining complicity did not contain the requirement that one must act with the kind of culpability required for the commission of an offense to be guilty of complicity, review of the record reveals that the requirement was included in Counts I through XIV. In particular, each of the instructions for

---

[6] We do note that the trial court properly gave the required instruction on the testimony of an accomplice. R.C. 2923.03(D).

Counts I through XIV indicated, in relevant part, that to find Haller guilty of the charged offense the jury had to find beyond a reasonable doubt that Haller acted with the kind of culpability required for the commission of the charged offense, by aiding or abetting another in committing the charged offense. Given the inclusion of these instructions for Counts I through XIV, we find Haller's argument to be without merit.

{¶50} Finally, we are not persuaded by Haller's argument that the trial court erred when it did not include an instruction that an accessory after the fact cannot be guilty of complicity. The Ohio Supreme Court has held that, if the trial court properly instructs the jury on Ohio law pertaining to complicity, it is under no obligation to also give an instruction on accessories after-the-fact. *State v. Carver*, 30 Ohio St.2d 280, 290 (1972); *State v. Boddie*, 3d Dist. No. 1-2000-72 (Sept. 6, 2001). Based on our foregoing discussion and having considered the complicity instruction in the context of the overall charge, we find that the trial court properly instructed the jury on complicity, and therefore was under no obligation to give an instruction on accessories after-the-fact.

{¶51} Given the foregoing, we find that the errors alleged by Haller in relation to the complicity instruction do not rise to the level of plain error.

{¶52} Furthermore, we find that Haller was not denied effective assistance of counsel. An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation

-27-

and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id.* at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), superseded by constitutional amendment on other grounds as recognized by *State v. Smith*, 80 Ohio St.3d 89, 103 (1997).

{¶53} Haller maintains that his counsel was ineffective because he failed to object to the complicity instruction given by the trial court. Having found that the trial court properly instructed the jury on complicity, we find that Haller was not denied effective assistance of counsel.

{¶54} Accordingly, we overrule Haller's fifth and sixth assignments of error.

*Assignment of Error No. I*

{¶55} In his first assignment of error, Haller contends that his convictions for Counts XI and XIII should be reduced from a second degree felony to a fourth

degree felony because the verdict forms for those counts do not comply with R.C. 2945.75(A)(2).[7] We agree.

R.C. 2945.75(A)(2) provides, in relevant part, as follows:

(A) When the presence of one or more additional elements makes an offense one of more serious degree:

* * *

(2) A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.

{¶56} In *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, the Ohio Supreme Court addressed R.C 2945.75(A)(2) and the language required in a verdict form to support a conviction for the greater degree of an offense. In *Pelfrey*, the defendant was charged with tampering with records in violation of R.C. 2913.42, with an enhanced charge to a third degree felony for tampering with government records pursuant to R.C. 2913.42(B)(4). The defendant was subsequently convicted and sentenced on the third degree felony conviction. On appeal, he argued that the jury verdict form and resulting judgment entry of conviction were insufficient to support his conviction for a felony of the third degree, because the verdict form and judgment entry did not state the degree of the offense or contain a finding that government records were involved. Accordingly,

---

[7] Although Haller's first assignment of error challenges the verdict form for Count XII, we note that based on his arguments he is, in fact, challenging the verdict form for Count XIII. Consequently, we will address his argument as it pertains to Counts XI and XIII.

he argued that, pursuant to R.C. 2945.75(A)(2), his conviction should only be for the lowest degree of the offense, a first degree misdemeanor. The appellate court agreed and remanded the matter for the trial court to enter a judgment convicting the defendant of a first degree misdemeanor.

**{¶57}** In affirming the appellate court's decision, the court stated, in relevant part:

> In this case, Pelfrey's offense of tampering with records would have constituted a misdemeanor under R.C. 2913.42(B)(2)(a) but for the additional element that the records at issue were government records, a circumstance that elevates the crime to a third-degree felony under R.C. 2913.42(B)(4). However, neither the verdict form nor the trial court's verdict entry mentions the degree of Pelfrey's offense; nor do they mention that the records involved were government records. The statute provides explicitly what must be done by the courts in this situation: the "guilty verdict constitutes a finding of guilty of the least degree of the offense charged." R.C. 2945.75(A)(2).
>
> Because the language of R.C. 2945.75(A)(2) is clear, this court will not excuse the failure to comply with the statute or uphold Pelfrey's conviction based on additional circumstances such as those present in this case. The express requirement of the statute cannot be fulfilled by demonstrating additional circumstances, such as that the verdict incorporates the language of the indictment, or by presenting evidence to show the presence of the aggravated element at trial or the incorporation of the indictment into the verdict form, or by showing that the defendant failed to raise the issue of the inadequacy of the verdict form. We hold that pursuant to the clear language of R.C. 2945.75, a verdict form signed by a jury must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense. *Pelfrey* at ¶ 13-14.

{¶58} Shortly after *Pelfrey* was decided, this court held that a third degree felony conviction for intimidation of a crime victim or witness in violation of R.C. 2921.04(B) must be remanded for a first degree misdemeanor conviction under R.C. 2921.04(A). Our basis for this holding was that the jury verdict form only found the defendant guilty of intimidation "in manner and form as he stands charged in the indictment," and failed to include the degree of the offense, the statutory section of the offense, or any finding of the aggravating factor elevating the offense to a third degree felony. *State v. Sessler*, 3d Dist. No. 3-06-23, 2007-Ohio-4931. In *Sessler*, the requirements of R.C. 2945.75 were not met and the jury verdict form did not contain the degree of the offense or a finding of the aggravating factor. Based on this and our strict interpretation of *Pelfrey*, we found that, even though "Sessler was properly charged, the jury instructions specified the correct offense and degree, and the verdict form incorporated by reference the indictment[.]" the third degree felony conviction could not stand. *Id.* at ¶ 13. Subsequently, the Ohio Supreme Court accepted *Sessler* for review, and affirmed our implicit finding that *Pelfrey* was applicable to charging statutes containing separate sub-parts with distinct offense levels. *State v. Sessler*, 119 Ohio St.3d 9, 2008-Ohio-3180.

{¶59} Here, Haller was charged with complicity to commit burglary under R.C. 2911.12(A)(2) and R.C. 2923.03(A)(2). The burglary statute provides, in relevant part:

(A) No person, by force, stealth, or deception, shall do any of the following:

\* \* \*

(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense;

\* \* \*

(4) Trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present.

\* \* \*

(C) Whoever violates this section is guilty of burglary. A violation of division (A)(1) or (2) of this section is a felony of the second degree. A violation of division (A)(3) of this section is a felony of the third degree. A violation of division (A)(4) of this section is a felony of the fourth degree. R.C. 2911.12.[8]

{¶60} Although Haller was indicted under section (A)(2) of R.C. 2911.12 and the jury was instructed under section (A)(2) of the same statute, we find, and the State concedes, that the verdict forms for Counts XI and XIII are insufficient to convict Haller of second degree felonies. *See Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, at ¶ 14. The verdict forms for Counts XI and XIII are identical and read as follows:

---

[8] This version of R.C. 2911.12 was in existence at the time of Haller's indictment and trial.

> We, the jury, being duly impaneled and sworn, find the Defendant, Ronald L. Haller <u>guilty</u> of Complicity to Burglary. (Docket No. 114, 116).

{¶61} Clearly, the verdict form contains neither the degree of the offense nor the aggravating elements of R.C. 2911.12(A)(2) as required by R.C. 2945.75(A)(2). Consequently, the verdict forms for Counts XI and XIII are insufficient to convict Haller of second degree felonies.[9] Thus, we must remand this matter to the trial court to enter a judgment convicting Haller of complicity to commit burglary as a fourth degree felony, pursuant to R.C. 2911.12(A)(4), and to impose sentences accordingly.

{¶62} Accordingly, we sustain Haller's first assignment of error.

*Assignment of Error No. III*

{¶63} In his third assignment of error, Haller contends that R.C. 2941.25 is unconstitutionally vague. We disagree.

{¶64} After careful review of the record, we note that Haller did not challenge the constitutionality of R.C. 2941.25 before the trial court. This is significant because "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly

---

[9] We note that this case was submitted to this court in March 2012. Since that time, the Ohio Supreme Court has revisited the application of R.C. 2945.75(A)(2) in *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224. Though the parties did not have the opportunity to brief the effect of *Eafford* on Haller's first assignment of error, we have considered *Eafford* and still find that the verdict forms for Counts XI and XIII are insufficient to convict Haller of second degree felonies.

procedure, and therefore need not be heard for the first time on appeal." *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. It is, however, within the reviewing court's discretion to address the constitutional argument under a plain error analysis or where the rights and interests involved may warrant review. *In re M.D.*, 38 Ohio St.3d 149 (1988), syllabus. Upon consideration, we decline to exercise our discretion to review Haller's constitutional challenge of R.C. 2941.25.

{¶65} Accordingly, we overrule Haller's third assignment of error.

*Assignments of Error Nos. II & IV*

{¶66} In his second and fourth assignments of error, Haller contends that the trial court erred when it did not merge Counts XI, XII, and XV together and Counts XIII and XIV together, because the offenses are allied offenses of similar import. Haller also contends that the current process by which offenses are determined to be allied violates his right to notice, his right to a trial, and the requirement that the state prove his guilt beyond a reasonable doubt. We agree in part and disagree in part.

{¶67} Ohio's statute concerning multiple counts, R.C. 2941.25, provides as follows:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or

more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶68} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme Court clarified the application of R.C. 2941.25. Specifically, the court overruled *State v. Rance*, 85 Ohio St.3d 632 (1999), "to the extent that it calls for a comparison of statutory elements solely in the abstract under R.C. 2941.25. [Now w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Johnson* at ¶ 44.

{¶69} *Johnson* describes the test for determining whether offenses are allied as follows:

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the [first] question is whether it is possible to commit one offense *and* commit the other offense with the same conduct, not whether it is possible to commit one *without* committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.
>
> If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act committed with a single state of mind.'
>
> If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged. (Emphasis sic; Citations omitted.) *Johnson* at ¶ 48-50.

Counts XI, XII, and XV (Ottawa Burglary)

{¶70} Haller contends that Counts XI, XII, and XV (complicity to burglary, complicity to grand theft, and receiving stolen property, respectively) are allied offenses of similar import. In support, Haller advances two alternative arguments, which we will address in turn.

{¶71} Before we address Haller's arguments, we note that we will consider whether burglary and grand theft are allied offenses, as opposed to the offenses for which Haller was convicted, complicity to commit burglary and complicity to commit grand theft.[10] Pursuant to R.C. 2923.03(F), "[w]hoever violates [R.C. 2923.03] is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender." Since an accomplice is punished as if he or she were a principal offender, a court, when determining the issue of merger, must necessarily consider the offenses the accomplice was found to have aided and/or abetted. Here, Haller aided and/or abetted Woolwine, the principal offender, in committing burglary and grand theft. Consequently, we will consider whether burglary and grand theft are allied offenses. Bearing this in mind, we turn our attention to Haller's arguments.

{¶72} First, Haller argues that based on the definition of trespass, a burglary is completed when the person vacates the premises in which they trespassed. Consequently, Haller maintains that any crime that is committed

---

[10] Based on the parties' arguments on appeal, they agree with the scope of our analysis.

during the course of the burglary should merge with the burglary offense. We disagree.

**{¶73}** For purposes of burglary, trespass is defined as a violation of the statute defining criminal trespassing. R.C. 2911.10. That statute, in relevant part, provides that "[n]o person, without the privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another." R.C. 2911.21(A)(1). Haller contends that the phrase "remain on the land or premises" means that as long as the trespasser remains on the land or premises he or she has not completed the trespass, and therefore has not completed the burglary.

**{¶74}** This is a novel yet incorrect interpretation of the statute defining trespass. First, Haller misinterprets the meaning of "remain on the land or premises." Contrary to Haller's interpretation of "remain on the land or premises," the term "remain" refers to those situations where an individual, who initially has a privilege to enter onto another's land or premises, knowingly remains on the land or premises after the privilege has lapsed or has otherwise been revoked. *See City of Columbus v. Peoples*, 10th Dist. No. 05AP-247, 2006-Ohio-1718 (though defendant initially had a privilege to enter hospital's premises, he was found guilty of criminal trespass when he remained on the hospital's premises after the privilege to remain thereon was revoked by the hospital's employees). Second, and more importantly, Haller ignores the existence of the word "or" between "enter" and "remain." The presence of "or" is significant as it

indicates that a trespass can be completed in one of two ways; by entering *or* remaining, without privilege to do so, on another's land or premises. Accordingly, the trespass element of burglary is satisfied when either the perpetrator, without a privilege to do so, knowingly enters the victim's premises, which occurred here, *or* when the perpetrator, though initially having a privilege to enter the premises, knowingly remains on the premises after that privilege has lapsed or been revoked. *See, e.g.*, *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 68 (burglary was complete as soon as defendant entered the apartment by deception with the intent to commit a theft offense). Given the foregoing, we find Haller's first argument to be without merit.

{¶75} Notwithstanding his foregoing argument, Haller also cites several cases in which other courts of appeal, applying *Johnson*, have determined that burglary and theft are allied offenses of similar import. *State v. Blackburn*, 4th Dist. No. 10CA46, 2011-Ohio-4624 (finding counts of burglary, theft, and receiving stolen property were allied offenses because they were committed with single act); *State v. James*, 5th Dist. No. 11 CAA 05 0045, 2012-Ohio-966 (finding counts of burglary and theft were allied offenses because they were committed through the same course of conduct and single state of mind). Having considered the holdings in the cases cited by Haller, we find the cases to be distinguishable from the instant case.

-38-

{¶76} Without addressing the first step under *Johnson*, we find, under the facts of this case, that the burglary and grand theft offenses associated with Counts XI and XII, respectively, were committed by two separate acts. Woolwine testified that after the residents left the Ottawa Road residence he broke in and proceeded to ransack the residence taking guns, archery equipment, knives, an Xbox, and several video games and movies. According to Woolwine's testimony, the burglary was complete upon entering the residence. At this time, none of Woolwine's actions satisfied any of the elements of grand theft. It was not until Woolwine exerted control over Lhamon's guns, an act which undoubtedly occurred apart from the unlawful entry into the residence, that Woolwine committed grand theft. *See State v. Crosby*, 12th Dist. Nos. CA2010-10-081, CA2011-02-013, 2011-Ohio-4907 (finding counts of burglary and grand theft were not allied offenses because defendant committed burglary with a different act and a separate animus from grand theft); *see also State v. Sludder*, 3d Dist. No. 1-11-69, 2012-Ohio-4014, ¶ 14 (Breaking and entering and burglary are not allied offenses), citing *State v. Brewer*, 3d Dist. No. 16-11-13, 2012-Ohio-3899, ¶ 45 (same). Given the foregoing, we find that Counts XI and XII were not committed with the same conduct, i.e., a single act, and therefore are not allied offenses.

{¶77} As for Count XV, receiving stolen property, we find, and the State concedes, that Count XV merges with Count XII, grand theft. First, we find that it is possible to commit theft and receiving stolen property with the same conduct.

Second, upon review of the record, it appears that Counts XII and XV both relate to Woolwine's act of stealing guns from the Ottawa Road residence. Given the foregoing, we find that Counts XII and XV are allied offenses.

{¶78} Accordingly, we find that the trial court did not err when it determined that Counts XI and XII were not allied offenses, but did err when it determined that Counts XII and XV were not allied offenses.

Counts XIII and XIV (Highland Burglary)

{¶79} Haller contends that Counts XIII and XIV (complicity to commit burglary, complicity to commit grand theft) are allied offenses of similar import. We disagree.

{¶80} Again, without addressing the first step under *Johnson*, we find, under the facts of this case, that the burglary and grand theft offenses associated with Counts XIII and XIV, respectively, were committed by two separate acts, and therefore are not allied offenses.

{¶81} Accordingly, we find that the trial court did not err when it determined that Counts XIII and XIV were not allied offenses.

Process of Determining Allied Offenses

{¶82} Finally, Haller contends that the current process by which offenses are determined to be allied violates his right to notice, his right to a trial, and the requirement that he be proven guilty beyond a reasonable doubt. Specifically, Haller contends that the State should be required to provide the defendant notice in

cases where it intends to argue against the existence of allied offenses; that the fact finder should determine whether the offenses at issue were committed with the same conduct and animus; and, that the state must prove beyond a reasonable doubt that the offenses alleged to be allied were not committed with the same conduct and animus. As a result of Haller's contention, he requests that we remand this matter for a new trial and require the State "to prove separate animus to a new jury." Appellant's Br., p. 15. We disagree.

{¶83} Initially, we note that Haller cites no authority in support of his contention. Notwithstanding a lack of supportive authority, we are not persuaded by Haller's argument. The law is clear; the trial court, not the fact finder, determines whether offenses are allied as this is a question of law, not an issue of fact. Contrary to Haller's assertion, we fail to see how this process prejudicially affects, as he phrases it, his right to notice, his right to a trial, and the requirement that he be proven guilty beyond a reasonable doubt. As a result, we find Haller's contention to be without merit.

{¶84} Accordingly, we sustain in part and overrule in part Haller's second assignment of error, and overrule Haller's fourth assignment of error.

{¶85} Having found no error prejudicial to Haller herein, in the particulars assigned and argued in the third, fourth, fifth, sixth, and seventh assignments of error, but having found error prejudicial to Haller, in the particulars assigned and argued in the first and second assignments of error, we affirm in part, and reverse

in part, the judgment of the trial court, and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**